UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEAN ROSALES and NIRAV SHAH, Individually and on Behalf of all Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>   v.<br><br>FORCEFIELD ENERGY INC., DAVID NATAN, JASON WILLIAMS, RICHARD ST-JULIEN,<br><br>                    Defendants. | No. **15 CV 3279**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>APR 27 2015<br><br>JURY TRIAL DEMANDED |

Plaintiffs Dean Rosales and Nirav Shah ("Plaintiffs"), by and through the undersigned attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (a) a review and analysis of regulatory filings made by ForceField Energy Inc. ("ForceField" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by ForceField; and (c) a review of other publicly available information concerning ForceField.

<u>**SUMMARY OF THE ACTION AND OVERVIEW**</u>

1.    This is a federal securities class action on behalf of all persons or entities who purchased or otherwise acquired ForceField securities between September 16, 2013 and April 15, 2015 inclusive (the "Class Period"). Plaintiffs seek to pursue remedies against ForceField and certain of its officers named as Defendants herein for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      ForceField is a designer, distributor and licensee of alternative energy products and solutions.  The Company distributes light emitting diode ("LED") commercial lighting and fixtures. It also uses waste heat from manufacturing sources to provide clean electricity.

3.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) some of the reports were issued by promoters, who were not independent authors, but rather were paid by the Company to tout the Company and were reviewed by ForceField's management before publication; and (2) members of ForceField's management have been sued for fraudulently misrepresenting companies with which they were involved, and for engaging in unethical practices.

4.      On April 15, 2015, a *Seeking Alpha* article stated that "ForceField Energy is a stock promotion pure and simple" and that  "[t]he company has been engaging paid promoters to issue a series of upbeat reports on its prospects which has successfully powered the stock higher." In addition, the article stated that ForceField Energy's "[m]anagement has a troubling history of involvement with fraudulent companies, misleading investors and the ability to shift money around in international locations such as Costa Rica, where ForceField continues to maintain the bulk of its operations."

5.      On this news, the price of ForceField shares dropped over 21% on April 15, 2015.

6.      Then, on April 20, 2015, a *Bloomberg* article reported that Richard St-Julien ("St-Julien"), former chairman of ForceField Energy, "was arrested and had resigned as chairman." St-Julien "was charged . . . with scheming to boost the company's share price in part by making secret payments to conspirators through a firm based in Belize."

7.      ForceField stock was halted on April 20, 2015 and is currently down nearly 60% from its close on April 14, 2015.

8.      As a result of Defendants' wrongful acts and omissions, ForceField shares traded at artificially inflated prices during the Class Period, and Plaintiffs and other Class members suffered significant losses and damages. Plaintiffs and the Class collectively incurred significant losses on their investments in ForceField securities. Accordingly, Plaintiffs hereby bring claims against ForceField and certain of the Company's senior executives and Directors that exercised control over the Company during the Class Period. Plaintiffs' claims arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27(c) of the Exchange Act (15 U.S.C. §78aa(c)). Many of the acts complained of herein, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants occurred, at least in part, in this District.  Additionally, the Company is headquartered in this District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

3

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.     Plaintiffs Dean Rosales and Nirav Shah, as set forth in the accompanying certifications, incorporated by reference herein, purchased ForceField shares during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Defendant ForceField is a Nevada corporation with principal executive offices located in this District at 245 Park Avenue, Suite 212, New York, New York 10167. Through its subsidiaries, ForceField designs, distributes, and licenses alternative energy products and technologies in the People's Republic of China ("PRC") and the United States. ForceField distributes LED commercial lighting products and fixtures; and produces trichlorosilane, a chemical used for the production of polysilicon that is utilized as a raw material in the production of solar cells for photovoltaic panels.  The Company also designs and installs proprietary modular organic rankine cycle units utilizing various refrigerant mixtures to enhance heat recovery and convert that waste heat directly into electrical energy.  ForceField's common stock is listed on NASDAQ under the ticker symbol "FNRG."

14.     Defendant David Natan ("Natan") has served as the Chief Executive Officer ("CEO") and a director of ForceField since December 8, 2010 and throughout the Class Period. He previously served as the Company's Chief Financial Officer ("CFO") from February 9, 2010 until his resignation on October 17, 2011.

15.     Defendant Jason Williams ("Williams") has served as the Company's CFO since October 17, 2011 and throughout the Class Period.

16.     Defendant Richard St-Julien ("St-Julien") has served as the Company's Executive Chair of the Board of Directors throughout the Class Period.

17.     Defendants Natan, Williams, and St-Julien are referred to herein as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of ForceField's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   The Individual Defendants made specific false and misleading statements and/or reviewed and approved the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

18.     Each Individual Defendant's primary liability and controlling person liability arises from the following facts, among others: (a) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior officers of the Company, were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (c) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and were advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the

Company's finances, operations, and sales at all relevant times; and (d) the Individual

Defendants were aware of the Company's dissemination of information to the investing public

which they knew and/or recklessly disregarded was materially false and misleading.

19.    ForceField and the Individual Defendants are collectively referred to herein as the

"Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Class Period

*Undisclosed Paid Stock Promotion*

20.    On September 16, 2013, the Company issued a press release entitled *ForceField*

*Energy Announces Engagement of MissionIR Investor Relations Services*.   The press release

states in relevant part:

> ATLANTA, GA--(Marketwired - Sep 16, 2013) - ForceField Energy Inc.
> (OTCQB: FNRG) (the "Company") today announces that they have engaged the
> investor relations services of MissionIR. Through a network of investor-oriented
> sites and full suite of investor awareness services, MissionIR broadens the
> influence of publicly traded companies and enhances their ability to attract growth
> capital as well as improve shareholder value.
>
> "ForceField Energy has an exciting business model targeting two of the largest
> and fastest-growing areas of the global renewable energy space," stated Sherri
> Franklin, Director of Marketing at MissionIR. "The Company is well positioned
> in both sectors and has an experienced management team in place to fully execute
> its growth strategy."
>
> David Natan, CEO of ForceField Energy, stated, "Engagement of a full-service
> investor relations firm to develop and implement a strategic investor relations
> campaign is a key part of our overall strategy to achieve short-term and long-term
> goals. MissionIR is providing a much needed service in the small-cap markets."

21.    Under the direction and control of ForceField and the Individual Defendants,

securities advertiser and investor relation firms DreamTeamGroup ("DTG") and Mission

Investor Relations ("MissionIR"), began to tout ForceField stock throughout the Class Period.

22.     The purpose of this promotional campaign was to raise additional capital, increase shareholder value, and raise visibility to the public capital market.

23.     DTG and MissionIR are affiliated with one another. DTG and MissionIR conducted a massive promotional campaign, which included publishing articles or news reports and making various statements through various social media outlets and websites, including *SeekingAlpha.com*.

24.     The articles did not disclose that they were authored by paid promoters under the control of ForceField, nor did they disclose the fact that the authors had a business relationship with ForceField.

25.     Articles by DTG's paid authors Tom Meyer and John Mylant caused a steep run-up in the Company's stock price as well as the articles created by MissionIR. Not only did they publish articles under their own names, but they used pseudonyms. For example, Tom Meyer wrote under the name "Wonderful Wizard."

26.     On October 28, 2013, Tom Meyer, published an article under the name "Wonderful Wizard," entitled *3 Reasons To Buy ForceField Energy*, on *SeekingAlpha*. The article touted the Company's business prospects and gave investors several reasons why it was a good investment. However, this article failed to disclose that it was a promotion piece paid for by the Company. The article stated the following in pertinent part:

> ForceField appears to be in the right industry at the right time. With the world's focus turning to renewable energy, the potential that the company has is immense. LED lighting and clean electricity represent two of the fastest growing markets in the industry and it just so happens that ForceField is at the forefront of both. With the company's smart use of resources, the recent technical strength, the latest strategic transactions in various countries, and the massive market potential, it appears that ForceField represents an excellent opportunity for investors.

27.     On November 27, 2013, John Mylant of DTG published an article entitled *ForceField Energy Is One Company Worth Watching In The LED Industry*, on *Seeking Alpha*. This article also touted ForceField as a good investment. This article also failed to disclose that it was a promotion piece paid for by the Company.

### Management's Lack of Disclosures of Its Past

28.     On April 15, 2014, the Company filed its Form 10-K for the year ending December 31, 2013 with the SEC ("2013 Form 10-K").  With regards to the background information concerning the Individual Defendants, the 2013 Form 10-K incorporated by reference the solicitation of proxies for the Company's 2014 Annual Meeting of Shareholders ("2014 Proxy Statement"). The 2013 Form 10-K was signed by all Individual Defendants.

29.     On April 30, 2014, the Company filed the 2014 Proxy Statement with the SEC on Form DEF 14A.  The 2014 Proxy Statement includes information about the executive officers of ForceField including Individual Defendants.  The Proxy, signed by Defendant St-Julien,  stated the following with regards to the Individual Defendants' prior occupations:

> The following includes the principal occupations for the past five years (and, in some instances, for prior years) of each of our executive officers:
>
> Mr. Natan is a seasoned financial executive. Formerly a Big Four CPA with Deloitte Touche, he has more than thirty years of experience in areas of accounting, treasury, finance, corporate operations, and executive level management of both public and private companies. Mr. Natan was appointed our Chief Financial Officer and Director in February 2010 and was appointed our Chief Executive Officer in December 2010. Mr. Natan maintained both positions until October 2011 when Jason Williams was appointed our Chief Financial Officer. From November 2007 through January 2010, Mr. Natan was President of Natan & Associates, LLC, a financial consulting firm. Mr. Natan's career has spanned a wide range of industries. He has previously served as CFO/Treasurer of four public companies and as CFO of three private companies. During his tenure as CFO, his public company was ranked as one of Forbes Magazine's "Top 50 Best Small Companies in America" for three consecutive years. He also served as

a Director of a public company and as President of a public company subsidiary. Mr. Natan has participated in over fifteen merger and acquisition transactions. He has been instrumental in raising in excess of $500 million of debt and equity capital on favorable terms and from a variety of funding sources. Mr. Natan holds a B.A. in Economics from Boston University, where he was elected to the National Economics Honor Society. He also holds a Certified Public Accountant license (inactive) in the state of Florida.

Mr. ST Julien has been a Director, Secretary and Chief Legal Officer of the Company since 2009 and Chairman of the Board of Directors since October 2011. Mr. ST Julien holds a Bachelor of Law from the University of Ottawa. Since 1992, he has been a practicing attorney in the areas of Commercial and International Law. Simultaneously, he has been involved in numerous business ventures as entrepreneur in Canada, in the United States as well as in other countries. Mr. ST Julien specializes in both International Business Law and Securities law in collaboration with strategic partners in Canada in the USA and in China. He possesses several years of experience in the public company environment, mostly in the USA, where he was involved in various listings, reorganizations, financings and acquisitions. Additionally, he acts as a consultant to corporations in their business ventures, including international financing. Finally, Mr. ST Julien has held positions in various public companies, such as secretary and member of the board of directors and officers.

Mr. Williams has served as Chief Financial Officer and Corporate Treasurer since October 2011. Mr. Williams has significant financial and operational experience with publicly traded companies. From August 2007 to August 2010, he served as Corporate Controller and Chief Financial Officer at Protective Products of America, Inc. and its successors. From July 2002 to August 2007, he served as Corporate Controller and Director of Reporting & Analysis at PharmaNet Development Group, Inc. From 1995 to 2002, he served in various financial leadership positions with Patagon.com, Inc., vFinance, Inc. and The BISYS Group. Mr. Williams has served as President of WM Consulting, LLC, a business advisory firm, since March 2001. He holds a Bachelor of Science from Florida Atlantic University.

30.    The statements referenced in ¶¶20-29 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) some of the reports touting the Company were issued by promoters paid for by the Company who were not independent authors but rather

9

were paid for by the Company and were reviewed by ForceField's management before publication and (2) Members of ForceField's management have been sued for fraudulently misrepresenting companies with which they were involved, and for engaging in unethical practices.

### The Truth Finally Emerges

31.     On April 15, 2015, *SeekingAlpha* published an article entitled, *ForceField Energy: Undisclosed Promotions And Management Connections To Past Frauds*, which further revealed the undisclosed promotion and control and knowledge over DTG activities. The article states in relevant part:

> In the past, **ForceField was a Dream Team client. The Dream Team was a firm that got paid to write undisclosed paid articles, which were edited and approved by management teams of their clients. The retail targeted articles were designed to prop up the share price and volume so that companies could issue stock to raise money. The scam worked exceptionally well**.
>
> * * *
>
> Back in 2014, I wrote a detailed article about stock promotion firm "The Dream Team Group" which was hiring out writers to conduct undisclosed paid promotions on small cap companies. The writers would pretend to be well qualified industry experts putting forth a professional analysis (and a strong buy) on a stock. In fact, they were simply hired gun writers with no credentials whatsoever. Yet their professional writings invariably caused their target stocks to soar. The authors managed to infiltrate a wide variety of locations, including Forbes.com, TheStreet.com, Seeking Alpha and the Wall Street Cheat Sheet.
>
> To gain information, I posed as a paid stock promoter looking to write undisclosed paid articles. The chief writer for the Dream Team (Tom Meyer) then began giving me assignments.
>
> The main stocks I wrote about in this promotion scandal were Galena Biopharma (NASDAQ:GALE) and CytRx (NASDAQ:CYTR), both of which ended up plunging by as much as 50-80% when the promotions unraveled. CytRx has rebounded some, while Galena has continued to plunge.
>
> But there were other companies which I did not give as much attention to because they were too small or illiquid to matter at the time. (Although I did not write

about many of these stocks, I did notify all of the various websites such as Seeking Alpha, TheStreet.com and Wall Street Cheat Sheet so that they could remove any articles and ban any violating authors).

***ForceField Energy is one such stock. At the time, it was one of a number of beaten down illiquid stocks which didn't seem to be catching the promotional wave. But now it appears that the continued promotional efforts have resulted in the stock hitting all-time highs on much greater volume. This is all occurring just as the company needs to raise money.***

***ForceField was a paid Dream Team promotion which was written about by both Tom Meyer (multiple aliases including Wonderful Wizard and others) and John Mylant. These were the two main Dream Team writers.*** Their articles have since been removed from Seeking Alpha, but the original references can still be found in various places. In addition, ***ForceField is listed among the other Dream Team clients on the Investors Hub page for Mission IR***. Mission IR was the Dream Team subsidiary responsible for handling the paid articles.

***Mr. Meyer was also attempting to recruit me as a paid writer specifically for ForceField. ForceField was an ongoing project of his.***

***It should be kept in mind that the standard process for these writers was to submit their drafts to management at the target company for review before publishing. In other words, management of these companies knew and encouraged the illegal stock promotion as a way of getting their share prices up.***

[Emphasis added].

32.    The *SeekingAlpha* article also disclosed the unscrupulous backgrounds of the Individual Defendants that they were required, but failed, to disclose in the Company's SEC filings. The article states in relevant part:

In reality, the notion that ForceField is being promoted before an equity raise should come as no surprise. Aside from their history of using the Dream Team to promote their stock, ***ForceField's three top managers all have extensive ties to past fraudulent companies which have gotten into substantial trouble, including investigations by the SEC, FBI, the US Senate and the Canadian Federal Government.***

ForceField is run by CEO David Natan. Notably, Mr. Natan does not name any of his past companies on his official bio. We can now see why.

From Bloomberg we can see the detailed history of Mr. Natan and his lengthy history of working with promotional companies based out of Boca Raton. For

those who don't know, Boca Raton happens to be the center of stock promotion (and sometimes fraud) in America.

Further digging shows that his past companies are mostly bankrupt former pink sheets companies based out of South Florida, such as MBf, Global Technovations and IMX Pharma.

***Just prior to running ForceField/SunSi, Mr. Natan was CFO of a company called SFBC and he was the one responsible for signing off on their financial statements.***

***SFBC was basically a south Florida recruitment mill for finding subjects (often illegal immigrants) to act as guinea pigs in clinical trials for drugs that had not yet been approved by the FDA. A lengthy and scathing exposé on SFBC can be found on Bloomberg, entitled "Big Pharma's Shameful Secret", and it is well worth reading.*** Anyone who has an interest in pharma or clinical trials should absolutely read that article. In the wake of this exposé, SFBC's share price fell by as much as 75%.

According to the fraud complaint filed in the District Court of New Jersey, SFBC told investors that it had a new state of the art facility which would drive the majority of revenues going forward. In fact, the building was nothing more than a dilapidated former Holiday Inn that was so structurally unsound that the Miami Dade County Unsafe Structures Board has since ordered the facility to be demolished.

It was fraud, plain and simple.

The fraud case goes on to state that:

SFBC risked its reputation and recruitment ability by utilizing a variety of unethical and dangerous practices that severely compromised the integrity of the drug trials conducted by the Company. For example, as detailed below, SFBC violated applicable minimum waiting requirements, used deceptive payment schemes to decrease the likelihood that a participant would report adverse reactions to the drugs being tested, failed to put into place adequate controls to prevent participants from applying to concurrent drug trials at other facilities, and failed to ensure that participants - the majority of whom are low-income individuals who speak English, if at all, as a second language - provided the required "informed consent."

Further, in order to ensure that SFBC's improper and unethical practices remained hidden from public view, the Company hired regulatory companies that were completely beholden to SFBC and its employees. For example, throughout the Class Period, SFBC paid hundreds of thousands of dollars to a regulatory company called Southern Institutional Review Board ("Southern IRB") - a

supposedly independent review board ("IRB") - to oversee and "approve" a substantial portion of their clinical tests. Southern IRB was owned and operated by the wife of a senior officer of SFBC. Similarly, SFBC utilized LeeCoast IRB to supervise its tests, despite the fact that LeeCoast IRB was owned by an SFBC subsidiary and employees of LeeCoast were paid directly by SFBC with checks prepared by SFBC's own accounting offices.

Clearly the goal of all of this was to prop up the stock so that money could be raised. And that plan worked quite well.

Defendants' untrue and misleading statements and omissions allowed SFBC to project the appearance of growth and success, which inflated the price of SFBC's securities and enabled the Company's insiders to enrich themselves at investors' expense. Indeed, during the Class Period, the individual defendants sold significant portions of their SFBC stock, generating tens of millions of dollars in personal profits. They were also able to orchestrate two large secondary offerings of SFBC securities, which allowed the Company to raise a total of approximately $250 million from unwitting investors.

Insider sales were large. As noted in the Sought Florida Business Journal, "SFBC execs pull in $15.71M from stock sales". This was just shortly before the fraud came unraveled and occurred before the stock price collapsed.

***CEO Natan isn't the only one with connections to fraudulent companies in his background. Like Mr. Natan, Chairman Richard St-Julien refrains from actually naming any of his past ventures or employers. He simply notes in his bio that:***

***Richard has a great deal of success and experience as a practicing attorney in the areas of Commercial and International Law. In addition, Richard has been involved in numerous business ventures as an entrepreneur in Canada, the U.S., China and other countries.***

***In reality, it is a bit more colorful than that. Mr. St. Julien appears to be an expert at moving money around in places such as (again, no coincidence) Costa Rica. Costa Rica is, of course, where ForceField ended up establishing its operations and where 100% of its assets were located until 2014.***

***In 2009, Mr. St. Julien was working as a lawyer in Costa Rica helping to funnel cash to and from convicted fraudster Jean LaFleur who was running a fraudulent scheme in Belize.***

The Canadian federal government was suing LaFleur for $7 million for his role in a government sponsorship scandal. According to the Globe and Mail:

Federal lawyers allege in the court documents that Mr. Lafleur "tried to liquidate his assets when it became obvious that [the government] would undertake legal action to recoup money that it had paid to [Mr. Lafleur] as part of his fraudulent scheme."… Mr. Lafleur said as part of his bankruptcy proceedings that he called on Mr. St-Julien to invest the money on his behalf in Liechtenstein, the Caribbean and Belize… Mr. St-Julien is a member of the Quebec bar, but he is working in Costa Rica, and has refused to explain what happened to $460,000 from the house sale that was invested in his Belize company, Parameter, which is now insolvent.

LaFleur was ultimately sent to prison for his role, but the money disappeared.

***As for ForceField's CFO, Jason Williams, he notes on his bio that he was previously at Protective Products of America (OTCPK:PPAFQ), which happens to be a pink sheets company that trades for less than 1 penny. Not surprisingly, Protective was based in South Florida. In the 3 years that it traded as a public company, Protective never filed a single financial statement, so it is unclear what Mr. Williams' actual duties might have been at that company. (At ForceField, financial statements have been delinquent in each of the past 3 years, again raising doubts about his role as CFO).***

But it gets better.

Prior to that, Williams notes that at PharmaNet he was an integral part of the management team that facilitated a market capitalization rise from $150 million to $800 million during a three-year period. It does sound impressive.

***However, this bio fails to mention some key facts. Most importantly, PharmaNet is in fact the same SFBC that settled fraud charges two years after the Bloomberg article.***

Yes, in fact, the stock did spike to a valuation of over $800 million during the tenure of Mr. Williams. But that was before it cratered to as low as $50 million (down 85%) in the wake of the Bloomberg fraud exposé.

I would encourage readers to re-read the fraud case against SFBC and its management to fully appreciate its implications.

From the introduction of the fraud case:

This is a case about a company that repeatedly misled investors about the most fundamental aspects of its business and operations. That company is SFBC, and throughout the Class Period, SFBC and its senior officers told investors that SFBC was a well-run business with highly-qualified management and significant competitive advantages in its field. In reality, however, SFBC suffered from a raft of undisclosed problems that infected its business and threatened the Company's very survival.

After the US Senate launched an official investigation into the company, they simply began running their clinical trials in Canada.

You can read about the name change and the move to Canada in this article.

*"Troubled SFBC changes its name in hope of changing its fortunes"*

*The point of this is that all three top managers have substantial ties to companies with fraudulent activities in the past. They are now all working together in a fledgling company that is hitting all-time highs even as there are obvious signs of stock promotion. And of course, the company happens to be out of money.*

[Emphasis added].

33.     The disclosure of this adverse information caused the price of ForceField securities to plummet $2.97 per share, or approximately 39%, over the next day to close at $4.74 per share on April 16, 2015, on heavy trading volume.

34.     On April 20, 2015, *Bloomberg* published an article entitled, *Ex-ForceField Energy Chairman Faces Stock Scheme Charges*, which reported that St-Julien "was arrested and had resigned as chairman."  St-Julien "was charged with scheming to boost the company's share price using secret payments to conspirators through a Belize-based firm." The article states in relevant part:

> *Trading in the alternative-energy company's stock was halted Monday morning after falling 22 percent at 10:21 a.m*. The New York-based company told investors in a regulatory filing Monday that St-Julien, founder and majority shareholder, was arrested and had resigned as chairman.

> *St-Julien is accused of scheming from August 2012 to this month to manipulate ForceField Energy's stock price with help from stock promoters, broker dealers* and a dermatologist in Boulder, Colorado, who bought shares on his behalf, according to a criminal complaint unsealed in Brooklyn federal court. *St-Julien paid individuals who made the trades using a Belize-based firm and bank account*, according to the complaint.

> St-Julien, 46, was arrested in Florida while preparing to board a plane for Costa Rica, where he lives, and made an initial court appearance in Fort Lauderdale on

Monday. He faces a maximum of 25 years in prison if convicted, according to prosecutors.

[Emphasis added].

35.     ForceField stock was halted by the NASDAQ stock market on April 20, 2015 and is currently down nearly 60% from its close on April 14, 2015.

## CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities who purchased or otherwise acquired ForceField securities from September 16, 2013 to April 15, 2015 inclusive.

37.     Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ForceField or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, which is complained of herein.

40.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of ForceField;

(c)     Whether the price of ForceField shares were artificially inflated during the Class Period; and

(d)     To what extent the members of the Class have sustained damages and the proper measure of damages.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

43.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

17

44.     During the Class Period, Plaintiffs and the Class purchased ForceField shares at artificially inflated prices and were damaged thereby.  When the misrepresentations that had been made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, the price of the Company's securities significantly declined, causing investors' losses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

45.     ForceField shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of ForceField shares and the market information relating to ForceField, and have been damaged thereby.

46.     During the Class Period, the artificial inflation of ForceField shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ForceField's business, operations, and financial prospects.  These material misstatements and/or omissions created an unrealistically positive assessment of ForceField and its business and financial condition, thus causing the price of the Company's securities to be artificially inflated at all relevant times and, when truthful information was disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices and being damaged as a result.

18

47.     At all relevant times, the market for ForceField securities was an efficient market for the following reasons, among others:

(a)     ForceField stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, ForceField filed periodic public reports with the SEC and/on the NASDAQ;

(c)     ForceField regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(c)     ForceField was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

48.     As a result of the foregoing, the market for ForceField securities promptly digested current information regarding ForceField from all publicly available sources and reflected such information in ForceField's stock price. Under these circumstances, all purchasers of ForceField securities during the Class Period suffered similar injury through their purchase of ForceField securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

49.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking statement was materially false or misleading and/or the forward-looking statement was authorized or approved by an executive officer of ForceField who knew, or was reckless in not knowing, that the statement was false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

50.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

51.     During the Class Period, the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase ForceField securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Individual Defendants took the actions set forth herein.

52.     The Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make

the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ForceField securities in violation of §10(b) of the Exchange Act and Rule 10b-5. The Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53. The Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about ForceField's business, operations, and financial performance and prospects, as specified herein.

54. The Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ForceField's value, performance, and continued substantial growth. These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ForceField and its business, operations, and financial prospects in light of the circumstances under which they were made, not misleading. As set forth more particularly herein, Defendants further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing

ForceField's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of ForceField securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, but not disclosed in public statements by the Defendants during the Class Period, Plaintiffs and the other members of the Class acquired ForceField securities during the Class Period at artificially high prices and were damaged thereby.

56.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding ForceField and its business and prospects, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their ForceField

securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

57.     By virtue of the foregoing, the Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

59.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.     The Individual Defendants acted as controlling persons of ForceField within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62.     As set forth above, ForceField and the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.   As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiffs serving as class representatives;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 27, 2015

Respectfully Submitted,

Joseph P. Guglielmo
Thomas L. Laughlin
Joseph V. Halloran
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
tlaughlin@scott-scott.com
jhalloran@scott-scott.com

David R. Scott
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com

*Counsel for Plaintiffs Dean Rosales and Nirav Shah*

# PLAINTIFF CERTIFICATION
# PURSUANT TO FEDERAL SECURITIES LAWS

Dean Rosales ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorizes Scott + Scott, Attorneys at Law, LLP, and such co-counsel with whom it deems appropriate to associate, to pursue this action on a contingent-fee basis.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff.s transaction(s) in the **FORCEFIELD ENERGY INC.** security that is the subject of this action during the Class Period is/are as follows:

| Date | Buy/Sell | No. of Shares | Price Per Share |
|------|----------|---------------|-----------------|
| 4/15/2015 | buy | 500 | 6.39 |
| 4/15/2015 | buy | 1500 | 6.8 |

5. During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a class representative in a federal securities fraud case unless such case is otherwise identified below.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 20th day of April, 2015 at 7:45 PM EDT at Chandler, Az.


Your Printed Name: Dean Rosales
Signature:          /s/ Dean Rosales
Mailing Address:    951 N. Forest Ct
                    Chandler Az 85226
Telephone Number:   480 293 4959
E-mail Address:     deanrosls@msn.com

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, __Niran Shah__, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I authorize Scott+Scott, Attorneys at Law, LLP to represent me in this matter.

2.      I am willing to serve as a representative party on behalf of the purchasers of ForceField Energy Inc. ("FNRG") securities during the Class Period, including providing testimony at deposition and trial, if necessary.

4.      I purchased and/or sold the FNRG Group securities as set forth on the attached Schedule A.

5.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.      During the three-year period preceding the date of my signing this Certification, I sought to serve, or served, as a representative party or lead plaintiff on behalf of a class in the following private actions arising under the Securities Act or the Exchange Act:

_____

_____

7.      I will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.


__04/21/15__                          __Niran J. Shah__
Date                                    Signature

## Schedule A

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share |
|---|---|---|---|
| 04/15/2015 | Buy | 200 | 57.24 |
| 04/15/2015 | Buy | 80 | 663 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



CIBC
Investor's Edge

Site Map   Contact Us   **Sign Off**

You have new eDocuments

Banking   **Investing**                                                                        April 21, 2015

**CIBC Investor's Edge**

**Transaction History**                                                             Print   Help

Account Information
- My Accounts
- Account Holdings
▸ Transaction History
- eDocuments
- Account Details
- News and Notes

███████ **Investment - Cash USD**

NIRAV SHAH

Get Stock Quote

Enter a symbol to get a quote

Trading
Order Status
Cash Transfers
Quotes and Research
Tools and Calculators
Investment Choices
Education Centre
Forms Centre
User Preferences
Contact Us

**Account:**            **Sub-Account(s):**
[ Investment ▾ ]     [ Cash USD ▾ ]   **Get Transactions**

As of April 21, 2015 at 5:09 PM ET                          **Download Transactions** 📥

View:  last 45 days  |  last 3 months  |  last 6 months  |  last 13 months  |  Custom Range

From:  March 08, 2015     To:  April 21, 2015

Filter By:  [ All Transaction Types ▾ ]  [ All Security Types ▾ ]  [ All Symbols ▾ ]   Clear Filters

| ⊟  ▾Date ⍰ | Type | Description | Symbol | Quantity | Price² | Amount |
|---|---|---|---|---|---|---|
| ⊟ T: Apr. 15, 2015<br>S: Apr. 20, 2015 | Buy | FORCEFIELD ENERGY INC<br>UNSOLICITED | FNRG:US | 200 | $7.24 | –$1,452.95 |
| ⊞ T: Apr. 15, 2015<br>S: Apr. 20, 2015 | Buy | FORCEFIELD ENERGY INC<br>UNSOLICITED | FNRG:US | 80 | $6.63 | –$535.35 |

**Latest Article from**
**Jamie**
**Golombek**